UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
WILLIAM D.,

                            Plaintiff,

                 -against-

FRANK BISIGNANO,
Commissioner of Social Security,[1]

                            Defendant.
------------------------------------------------------------X

**REPORT AND
RECOMMENDATION**

24 Civ. 3459 (NSR)(JCM)

To the Honorable Nelson S. Román, United States District Judge:

Plaintiff William D.[2] ("Plaintiff") commenced this action on May 6, 2024, pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3), challenging the decision of the Commissioner of Social Security (the "Commissioner"), which denied his application for Supplemental Security Income ("SSI") under the Social Security Act. (Docket No. 1).  Presently before the Court are (1) Plaintiff's motion for judgment on the pleadings, pursuant to Rule 12(c) of the Federal Rules of Civil Procedure, (Docket No. 13), accompanied by a memorandum of law, (Docket No. 14) ("Pl. Br."); (2) the Commissioner's opposition to Plaintiff's motion, (Docket No. 16) ("Comm'r Br."); and (3) Plaintiff's reply, (Docket No. 17) ("Pl. Reply").  For the reasons set forth herein, I respectfully recommend granting Plaintiff's motion and remanding the case to the Commissioner pursuant to sentence four of 42 U.S.C. § 405(g) for further proceedings consistent with this Report & Recommendation.

---

[1] Frank Bisignano is now the Commissioner of Social Security and is substituted for former Commissioner Martin J. O'Malley as the Defendant in this action, pursuant to Rule 25(d) of the Federal Rules of Civil Procedure.

[2] Plaintiff's name has been partially redacted in compliance with Federal Rule of Civil Procedure 5.2(c)(2)(B) and the recommendation of the Committee on Court Administration and Case Management of the Judicial Conference of the United States.

## I.     BACKGROUND

Plaintiff was born on August 7, 1985. (R.[3] 38).  He applied for SSI on October 29, 2015, alleging a disability onset date of June 1, 2015.[4] (R. 62-64).  Plaintiff's claim was initially denied on April 13, 2016. (R. 74).  Plaintiff submitted another application for SSI on March 19, 2016. (R. 192).  On May 10, 2016, Plaintiff requested a hearing. (R. 88).  On June 13, 2018, Plaintiff appeared and testified at a hearing before Administrative Law Judge ("ALJ") Aaron M. Morgan. (R. 32-61).  He was represented by counsel. (*Id.*).  At the hearing, Plaintiff's counsel requested the record be held open to submit a recent EMG nerve conduction report, and the record was held open until June 22, 2018. (R. 35-37).  However, Plaintiff did not submit any records after the hearing. (R. 17.).  ALJ Morgan issued a decision on July 5, 2018, finding that Plaintiff was not disabled and therefore was not entitled to SSI. (R. 14-24).  On September 9, 2018, the Appeals Council granted Plaintiff's request for more time before acting on his case. (R. 9-10). On February 25, 2019, the Appeals Council denied Plaintiff's request for review. (R. 1-3).

On April 23, 2019, Plaintiff filed a Complaint in the Southern District of New York, Case Number 1:19-cv-03591. (R. 615-18).  He sought review of the decision of the ALJ under 42 U.S.C. §§ 405(g), 1631(c)(3), and/or 1383(c)(3). (R. 616).  On January 27, 2020, the Honorable James L. Cott So Ordered the parties' stipulation remanding the matter to the Commissioner for further administrative proceedings. (R. 631).  On February 28, 2020, the Appeals Council vacated the final decision and remanded the case back to an ALJ to resolve three issues. (R. 633-36).  First, the Appeals Council stated the "hearing decision contains an inadequate evaluation of

---

[3] Refers to the certified administrative record of proceedings relating to Plaintiff's application for social security benefits, filed in this action on July 12, 2024. (Docket No. 8).  All page number citations to the certified administrative record refer to the page number assigned by the Social Security Administration ("SSA").

[4] At the 2018 hearing before the ALJ, Plaintiff's counsel agreed to use the application date of October 29, 2015 rather than the alleged onset date. (R. 42).

the claimant's foot impairment," noting the "decision does not contain any evaluation of the claimant's hammer toes or evaluate the severity of this foot impairment at step two," and it did not discuss the impact on Plaintiff's Residual Functional Capacity ("RFC"). (R. 635). Second, the decision "contains an inadequate evaluation of the opinion evidence," in that the "evaluation does not cite to specific evidence that is inconsistent with the opinions, or consider the regulatory factors for evaluating opinions." (R. 635-36). Third, the "decision contains an inadequate evaluation of the claimant's alleged symptoms," by not explaining how the claimant's treatment was considered minimal, by not properly characterizing Plaintiff's testimony about surgery, and by not evaluating an inconsistency in the statement regarding Plaintiff's independence in activities of daily living. (R. 636).

On November 29, 2022, Plaintiff attended a hearing before ALJ John Carlton. (R. 567-603). The case was subsequently reassigned to ALJ John T. Molleur. (R. 546-47). On remand, the ALJ considered whether the "claimant's foot impairment was severe," further evaluated the physicians' opinions, provided Plaintiff with an opportunity to submit additional evidence, evaluated Plaintiff's symptoms and rationale, gave further consideration to Plaintiff's maximum RFC, and obtained supplemental evidence from a vocational expert. (R. 546). ALJ Molleur issued a written decision on September 29, 2023, denying Plaintiff's claim. (R. 543-60). The Appeals Council did not assume jurisdiction, making the ALJ's decision after remand final. *See* 20 C.F.R. § 416.1484(d).

A.    **Medical Evidence**[5]

1.    **Stevenson Family Health Center**

On September 8, 2015, Plaintiff had an appointment with Dr. Harika Kondaveeti at the

Stevenson Family Health Center ("Stevenson") to discuss his elevated liver function tests

("LFTs"). (R. 291-98).  He informed Dr. Kondaveeti that he was "again binging on alcohol, 'a

lot' of liquor every day," but since receiving his LFT results, he had cut down on his alcohol

consumption. (R. 293).

On September 11, 2015, Plaintiff had a pre-operative examination with Dr. Kondaveeti in

advance of his right foot surgery. (R. 283-91).  Dr. Kondaveeti cleared Plaintiff for surgery. (R.

287).  On September 25, 2015, Plaintiff met with Dr. Avraham Ciment at Stevenson, to discuss

surgery for hammer toes on his right foot. (R. 280-83).  Dr. Ciment noted that Plaintiff had

reported "painful bent toes," and a "painful lesion" on the bottom of his foot for several years.

(R. 282).  Dr. Ciment planned to conduct a bunionectomy, a skin osteotomy, an arthroplasty, and

a condylectomy on Plaintiff's right foot. (*Id.*).

On November 6, 2015, Plaintiff saw Dr. Andrew Hwang at Stevenson, with complaints

of right foot pain related to his foot surgery at Montefiore on October 29, 2015. (R. 277-80).  Dr.

Hwang noted that Plaintiff had undergone a right foot hammer toe surgery, and he prescribed

sulindac and acetaminophen-codeine for the pain. (R. 279).

On March 8, 2016, Plaintiff returned to Dr. Kondaveeti, complaining of lower back pain

with sciatica. (R. 270-73).  Dr. Kondaveeti recorded Plaintiff's history of alcoholic pancreatitis,

hypertension, genital herpes, tobacco use, being overweight, moderate alcohol dependence in

early remission, and a cholecystectomy. (R. 270).  Medical student Lawrence Ku ("Mr. Ku")

---

[5] The Record contains duplicate and triplicate copies of multiple treatment notes and lab findings. (*See, e.g.*, R. 315-18, 343-46, 403-06).  For ease of reference, the Court does not cite to the duplicative notes.

indicated that Plaintiff had a "history of scoliosis" and that he presented with "2 weeks of low back pain" after coughing. (R. 271). Mr. Ku also observed that "[b]ecause of this pain, he cannot sit down." (*Id.*). Dr. Kondaveeti also reviewed Plaintiff's X-ray report from September 9, 2012, which revealed lumbar dextroscoliosis, six non-rib bearing lumbar type vertebral bodies, and disc space narrowing of the lower lumbar spine. (R. 2296).

On May 3, 2016, Plaintiff saw Dr. Kondaveeti again at Stevenson. (R. 2283-89). Dr. Kondaveeti diagnosed Plaintiff with a herniated lumbar intervertebral disc, genital herpes and tobacco use. (R. 2283). He also noted that Plaintiff's lumbar spine MRI revealed "disc bulging at multiple levels." (R. 2285). Dr. Kondaveeti referred Plaintiff to pain management for his chronic low back pain and disc bulges. (R. 2288).

On May 23, 2016, Plaintiff had a follow-up visit with Dr. Ciment following surgery. (R. 2276-80). He was diagnosed with hyperhidrosis of his feet and a hammer toe of his left foot. (R. 2277).

At a pre-operative cardiovascular examination on June 25, 2016, Dr. Kondaveeti determined Plaintiff could do at least one "functional status activit[y]" and was not considered "poor functionally." (R. 2264).

On August 29, 2016, Plaintiff had another follow-up appointment with Dr. Ciment for his foot pain. (R. 2247-52). He was diagnosed with plantar fascial fibromatosis, metatarsalgia of both feet, and bursitis of both feet and ankles. (R. 2247). At this appointment, Plaintiff complained of painful feet and heels, including after inactivity or excessive ambulation. (R. 2250). Dr. Ciment indicated that Plaintiff stated he "wants to return to work yet pain at times is so intense preventing [Plaintiff from] carrying out his daily activity." (*Id.*). Dr. Ciment observed

that Plaintiff had "flexed rigid digits," a diminished fat pad, low arches, "pronatory gait," plantar fasciitis, and bursitis. (*Id.*).

On January 4, 2017, Plaintiff saw Dr. Ciment for metatarsalgia in his right foot. (R. 2222-26). Plaintiff reported that his heel pain was better, but his callus pain was still present. (R. 2224).

On June 5, 2017 and October 16, 2017, Plaintiff had follow-up appointments with Dr. Ciment. (R. 2161-73). He complained of pain in his left foot with any type of ambulation, and that he had the same condition on the right foot, which had resolved with surgery. (R. 2171). Dr. Ciment wrote in the October 16 note that Plaintiff has "pain with ambulation [when weight bearing,] affecting his daily activity," and would be scheduled for foot surgery. (R. 2163). On December 11, 2017, Plaintiff attended a follow-up visit with Dr. Ciment for left foot surgery. (R. 2159-60).

On May 7, 2018, Plaintiff had a follow-up appointment after his Emergency Room visit for alcohol-induced pancreatitis. (R. 2143-49). Plaintiff reported a pain score of "0-None" at this visit. (R. 2145).

At Plaintiff's annual examination on September 22, 2020, Plaintiff reported low back pain for over ten years, with radiation down the left leg. (R. 2034). He stated he had a history of scoliosis, low back pain, and a herniated disc. (*Id.*).

On July 22, 2021, Plaintiff had a follow-up telehealth appointment with Physician's Assistant ("PA") Christiana Dankwah for an injury to his right ankle the preceding month. (R. 1981-85). Plaintiff reported "[s]ignificant improvement," and stated he had resumed all regular activities. (R. 1982-83).

On November 1, 2022, Plaintiff had an appointment with Family Nurse Practitioner ("FNP") Isheka Watkins, where he requested a referral for pain management. (R. 1961-68). FNP Watkins noted Plaintiff had chronic low back pain with left-sided sciatica, a herniated lumbar intervertebral disc, lumbago with sciatica, other intervertebral disc displacement of the lumbar region, and other chronic pain. (R. 1961). FNP Watkins referred Plaintiff to pain management. (R. 1964-65).

**2.    Distinguished Diagnostic Imaging, P.C.**

On February 22, 2016, Plaintiff had an X-ray of his right foot at Distinguished Diagnostic Imaging, P.C. ("DDI") following right podiatric surgery. (R. 301). The X-ray revealed "good alignment and positioning of the first digit," but "spur formation of the first metatarsophalangeal joint with small subchondral erosions." (*Id.*). There was no evidence of osteomyelitis. (*Id.*).

On March 24, 2016, Plaintiff received an MRI of his lumbar spine at DDI. (R. 303-04). The MRI revealed "normal bone alignment," a normal vertebral body marrow signal, "no vertebral body compression," and a normal sized conus. (R. 303). It also showed "multilevel disc space narrowing," "degenerative endplate change," "scattered disc desiccation," as well as several disc bulges and a small disc herniation. (*Id.*).

**3.    Castle Hill Medical of New York, Inc.**

On April 1, 2016, Plaintiff visited Dr. Elizabeth Mathew at Castle Hill Medical of New York, Inc. ("Castle Hill"), complaining of low back pain. (R. 2302-03). Dr. Mathew found Plaintiff had lower extremity strength of "4/5 in both" lower extremities, "negative straight leg raising," and no bursitis. (R. 2303). She also noted "[b]ack trigger points at postero supero iliac spine, paraspinal spasms, [and] lumbar paraspinal tenderness." (*Id.*). Dr. Mathew ordered physical therapy. (*Id.*).

On August 12, 2016, Dr. Mathew performed nerve conduction studies on Plaintiff, and found all "nerve conduction studies . . . were within normal limits." (R. 29-31). The study "revealed no electrical evidence of neuropathy or lumbar radiculopathy at this time." (R. 30).

**4.    New York Spine & Sport Rehabilitation Medicine, P.C.**

On June 14, 2016, Plaintiff saw Dr. Sireen Gopal at New York Spine & Sport Rehabilitation Medicine, P.C. ("New York Spine"). (R. 335-39). At that visit, Plaintiff complained of pain in the lower back that occasionally radiated into his bilateral hip and left leg. (R. 335). Dr. Gopal found Plaintiff's gait antalgic, observed his abnormal tandem walking, and observed "[f]lattening of lower back scoliosis." (R. 337). She found his lumbar spine range of motion limited due to pain. (*Id.*). Dr. Gopal planned imaging, epidurals, therapy, electrical stimulation, myofascial release, and hot/cold packs for Plaintiff's radiculopathy. (R. 337-38). She suggested Plaintiff begin taking Lyrica for his myalgia. (R. 338).

On October 13, 2016, December 21, 2016, March 31, 2017, and April 27, 2017, Plaintiff visited Nurse Practitioner ("NP") Geetha Ajay at New York Spine. (R. 322-34). He reported the same symptoms, and NP Ajay made the same observations of Plaintiff's condition as Dr. Gopal did. (*Id.*). On December 21, 2016, Plaintiff stated he had fallen the day before. (R. 328). NP Ajay recommended Plaintiff begin using back support and a cane for his radiculopathy, do physical therapy for his intervertebral disc disorders, and take Gabapentin and Tizanidine for his myalgia. (R. 326-27, 329-30, 333).

On April 7, 2017, Dr. Gopal completed a Medical Source Statement for Plaintiff. (R. 380-86). She diagnosed him with radiculopathy of the lumbar region, low back pain, and intervertebral disc disorder. (R. 380). Dr. Gopal determined Plaintiff had a reduced range of motion in his lower back, as well as tenderness. (*Id.*). She opined that Plaintiff's pain interfered

with his attention and concentration constantly, and served as a severe limitation on his ability to

deal with work stress. (R. 381). Dr. Gopal concluded that Plaintiff could sit for a maximum of

fifteen minutes before alternating postures or walking about and could sit for about one hour

total in an eight-hour workday. (R. 381-82). She further opined that he could stand and walk for

about fifteen minutes continuously before having to sit, and could stand or walk for a total of one

hour in an eight-hour workday. (R. 382-83). Dr. Gopal indicated that Plaintiff needed to rest

more often than the typical breaks in a workday, for about one hour of lying down, to relieve

pain. (R. 383). She stated he could occasionally lift one to ten pounds but never more than that,

and could never stoop. (R. 384). Dr. Gopal noted that Plaintiff would likely be absent from work

more than three times a month as a result of the impairments. (R. 386).

On May 11, 2017, Plaintiff saw Dr. Gopal at New York Spine and reported the same

pains. (R. 320-21). Dr. Gopal diagnosed Plaintiff with radiculopathy in the lumbar region,

intervertebral disc disorders with radiculopathy, low back pain, sciatica and myalgia. (R. 320).

She conducted a selective transforaminal epidural under fluoroscopic guidance. (*Id.*). Plaintiff

visited again on August 2, 2017, and Dr. Gopal administered another selective transforaminal

epidural steroid injection. (R. 312-14).

On June 8, 2017, September 7, 2017, October 12, 2017, and December 7, 2017, Plaintiff

visited NP Ajay at New York Spine. (R. 315-18, 387-98). He reported the same symptoms, and

NP Ajay made the same observations. (*Id.*). At the June 8 appointment, NP Ajay recommended

Plaintiff continue his treatment but stop the Gabapentin and start Gralise. (R. 316-17). On

September 7, NP Ajay added chronic pain syndrome to the list of conditions, and on October 12,

she added opioid use. (R. 392, 396). On September 7, she instructed Plaintiff to continue using

the back support and cane, to continue physical therapy, to start a TENS home unit, to re-start

Gabapentin, to stop Gralise and to refill his Tizanidine. (R. 396-97).  She also discussed spinal cord stimulation. (R. 397).  On October 12, NP Ajay directed Plaintiff to continue using back support, a cane, and physical therapy; she also instructed him to stop the TENS home unit, start Tramadol, ordered a drug screen test, instructed him to continue with the Gabapentin and Tizanidine, and discussed spinal cord stimulation treatment. (R. 392-94).  On December 7, NP Ajay directed Plaintiff to continue back support and cane use, instructed him to stop the TENS home unit, ordered a drug screen test, refilled his Gabapentin and Tizanidine prescriptions, and discussed spinal cord stimulation treatment. (R. 388-90).

On January 17, 2018, Plaintiff saw Dr. Gopal at New York Spine. (R. 481-83).  He reported the same pain, and she assessed the same conditions, in addition to spondylosis without myelopathy or radiculopathy. (R. 482).  Dr. Gopal administered a lumbar paravertebral facet joint injection. (*Id.*).

On February 13, 2018, Plaintiff saw Physical Therapist ("MPT") Manoj Thomas at New York Spine, complaining of pain when sitting and walking. (R. 478-80).  He reported the pain as a 9 out of 10. (R. 478).  MPT Thomas noted that Plaintiff was "[u]nable to perform work/sport activities without pain," and "[u]nable to perform daily home activities without pain." (R. 479).

On February 16, 2018, Plaintiff had a follow-up appointment with NP Ajay. (R. 474-77).  Plaintiff reported worsening pain in his left hip after his injection. (R. 474).  He described the pain as a 10 out of 10. (*Id.*).  NP Ajay directed Plaintiff to continue back support and use of his cane, to stop his TENS home unit and to stop Tramadol and Gabapentin, to continue Tizanidine and start Cymbalta, and provided him with information on lumbar facet joint/medial branch injection/blocks. (R. 475-77).  She ordered a drug test, and referred him to orthopedic surgeon Dr. John Olsewski for an evaluation of his chronic lower back pain. (R. 475-76).

On February 21, 2018, Dr. Gopal prepared another Medical Source Statement for Plaintiff. (R. 525-30).  She diagnosed him with radiculopathy of the lumbar region, intervertebral disc disorders, low back pain, sciatica, chronic pain syndrome, and myalgia. (R. 525).  Dr. Gopal noted a reduced range of motion in the lumbar spine and tenderness. (*Id.*).  She determined that Plaintiff's pain was severe enough to interfere with his attention and concentration constantly, that he had a marked limitation in his ability to deal with work stress, and that his medications caused sleepiness. (R. 526).  Dr. Gopal stated that Plaintiff could sit for a maximum of fifteen minutes before walking about or standing and a total of less than one hour during an eight-hour workday. (R. 526-27).  She also indicated that he could stand or walk for a maximum of thirty minutes before sitting and a total time of less than one hour during an eight-hour workday. (R. 527).  Dr. Gopal reported that he needed more rest, of about one hour during an eight-hour workday, to relieve pain from his impairments. (R. 527-28).  She determined he could lift and carry one to ten pounds occasionally and could never stoop. (R. 528).  Dr. Gopal stated Plaintiff required a cane to aid in both walking and standing, which was medically required only for "prolonged ambulation." (R. 529).  She anticipated he would need to be absent from work due to his impairments more than three times a month. (R. 530).

On February 22, 2018, Plaintiff had a follow-up appointment with Dr. Gopal, where he reported back pain with left leg radiating sensation. (R. 472-73).  Dr. Gopal found tenderness throughout his back and an antalgic gait. (R. 472).  She noted he needed maximum assistance, could not roll over on a bed, do knee crunches while seated, or lay down on his back. (*Id.*).  Dr. Gopal ordered physical therapy. (R. 472-73).

On May 31, 2018, Plaintiff had a consult with Dr. Olsewski at New York Spine. (R. 816-19).  Plaintiff's chief complaint was a "greater than two-year history of low back pain and left

lower extremity pain with paresthesias to the calf." (R. 816).  Dr. Olsewski observed Plaintiff's

"antalgic gait favoring left lower extremity," with a forty-five degree range of motion in the

lumbar spine, a positive straight leg raise test, a five out of five in motor exam, as well as range

of motion in all four extremities that did not reproduce pain. (R. 817).  Dr. Olsewski noted that

Plaintiff was "presenting with signs of symptomatology of lumbar radiculopathy from stenosis,"

and ordered X-rays, an MRI and EMG studies. (*Id.*).  The X-rays showed "a congenitally small

canal with short pedicles, degenerative changes with disc height loss," "retrolisthesis," and

"[i]nstability/stenosis/spondylosis." (R. 818).  The X-rays further revealed normal hip joints. (R.

819).  Plaintiff did not follow through on the MRI and EMG studies. (R. 814).

On December 27, 2019, Plaintiff had a follow-up visit with NP Ajay, where he

complained of lower back pain, radiating into his legs. (R. 805-07).  He rated the pain as a 7 out

of 10. (R. 805).  NP Ajay directed him to continue using his back support and cane for his

radiculopathy; instructed him to stop the TENS unit and Tramadol for his intervertebral disc

disorders; discussed the use of ECS care products for his low back pain; ordered a drug screen

test for his opioid use; referred him to Dr. Olsewski for his back pain; recommended he start

Gabapentin, Tizanidine and Cymbalta for his myalgia; explained spine stabilization and other

treatments for his spondylosis; and referred him to Dr. Randa Jaafar for medical marijuana use

and a physical therapy evaluation. (R. 806-07).

On January 7, 2020 and April 24, 2020, Plaintiff visited Dr. Jaafar. (R. 808-10).  Plaintiff

reported the same symptoms he had shared with Dr. Gopal and NP Ajay. (R. 808-09).  Dr. Jaafar

diagnosed Plaintiff with chronic pain syndrome. (R. 809).  He determined that Plaintiff met all of

the New York State criteria for medical marijuana, and Plaintiff said he would consider it. (R.

809-10).

Plaintiff had a follow-up visit with Dr. Olsewski on July 22, 2020. (R. 814).  Dr. Olsewski noted in the medical record that he had ordered an MRI and EMG studies at Plaintiff's initial visit two years prior, but Plaintiff "never obtained them and never came back." (*Id.*).  He also stated that a "previous MRI showed three levels of spondylosis, and [he] did explain to the patient today that those findings would be a poor harbinger of the potential for any surgical intervention to be therapeutic." (*Id.*).  Dr. Olsewski ordered the same MRI and EMGs he had ordered in 2018. (*Id.*).  The X-rays taken that day revealed a "congenitally small spinal canal with short pedicles," a "mild 10° lumbar scoliosis with grade 2 rotation," and "retrolisthesis." (R. 815).

On March 4, 2021 and August 23, 2021, Plaintiff had follow-up appointments with NP Ajay. (R. 1167-69, 1183-85).  He complained of the same pain, and NP Ajay made the same observations. (R. 1167-68, 1183-84).  On March 4, NP Ajay directed Plaintiff to continue using his back support and cane for his radiculopathy; explained the use of ECS care products for his low back pain; directed Plaintiff to stop Gabapentin, start Tizanidine and stop Cymbalta for his myalgia; and discussed a spine stabilization program for his spondylosis. (R. 1184-85).  On August 23, Plaintiff reported he had fallen on August 17, and hit his left knee and right ankle. (R. 1167).  NP Ajay directed Plaintiff to continue using the back support and cane for his radiculopathy, start Tizanidine for his myalgia, and continue with physical therapy. (R. 1168-69).  She also discussed use of ECS products and spine stabilization. (*Id.*).

In March 2021, Plaintiff had six physical therapy appointments with MPT Thomas, complaining of low back pain. (R. 1172-82).  On April 15, 2021, Plaintiff complained to MPT Thomas that he had "pain and stiffness in the mid back and the low back with radiating pain." (R. 1170).  At Plaintiff's October 19, 2021 physical therapy appointment, Plaintiff reported "pain

in the lower back radiating into the left leg with numbness and cram[p]s." (R. 1164).  He also reported falling in August 2021, which worsened his pain. (*Id.*).

**5.    Consultative Examinations**

On April 9, 2016, Dr. John Fkiaras completed an internal medicine examination for the Division of Disability Determination. (R. 307-09).  Plaintiff told Dr. Fkiaras that he suffers from low back pain since childhood, bilateral foot pain for the past five to six years, and had hammer toe surgery in 2015. (R. 307).  Plaintiff also informed Dr. Fkiaras that he has difficulty walking three blocks, does not walk upstairs, and has difficulty standing or sitting for more than fifteen to twenty minutes. (*Id.*).  Dr. Fkiaras noted that Plaintiff "cooks four times a week, cleans twice a week, does laundry twice a week, shops once a month, showers daily, bathes daily, dresses daily, watches TV, listens to the radio, reads, [and] socializes with friends." (*Id.*).

Upon physical examination, Dr. Fkiaras found Plaintiff "in no acute distress" with a normal gait. (R. 308).  While he noted that Plaintiff could not walk on his toes and could only squat three-fourths of the way down, Dr. Fkiaras observed that Plaintiff could walk on his heels, did not use assistive devices, and was able to change for the exam, get on and off the exam table, and rise from a chair. (*Id.*).  Dr. Fkiaras observed "[n]o scoliosis, kyphosis, or abnormality in thoracic spine." (*Id.*).  He found "pain to palpation over the lumbar spine," but "[f]ull lumbar extension, lateral flexion bilaterally, and fully rotary movement bilaterally." (*Id.*).  The straight leg raise test was negative bilaterally. (*Id.*).  Dr. Fkiaras opined that Plaintiff "has a moderate limitation with regard to repetitive heavy lifting, carrying, pushing, and pulling . . . a mild to moderate limitation standing extended periods . . . a moderate to severe limitation bending . . . [and] a mild limitation for repetitive squatting." (R. 309).

Plaintiff had a second consultative examination with Dr. Fkiaras on September 11, 2017. (R. 369-72). Plaintiff told Dr. Fkiaras that he "has had low back pain since childhood," and was diagnosed with scoliosis as a child. (R. 369). Plaintiff complained that he has "difficulty walking one block, climbing five steps of stairs, standing 10 to 15 minutes, and sitting 10 to 15 minutes." (*Id.*). Plaintiff also reported that the pain in his low back was a 6 to 10 out of 10 "shooting pain, which radiates to the left lower extremity," and that medications, physical therapy and epidural injections do not alleviate the pain. (*Id.*). Plaintiff reported cooking daily, cleaning three times per week, shopping once per week, and showering with assistance. (R. 370). Dr. Fkiaras observed that Plaintiff did not appear to be in acute distress, had a "slow, moderately antalgic gait," could not walk on his heels or toes, could only squat one-third of the way down, wore a low back brace, did not need help changing for the exam or getting on or off the exam table, and could rise from the chair. (*Id.*). Dr. Fkiaras found no scoliosis, but Plaintiff's lumbar spine demonstrated a flexion of 30 degrees, and Plaintiff experienced pain with palpation of the lumbar spine. (R. 371). He concluded that Plaintiff had a "moderate limitation for repetitive heavy lifting, carrying, pushing, and pulling . . . a mild to moderate limitation standing extended periods . . . a mild to moderate limitation walking . . . a moderate limitation climbing multiple flights of stairs . . . [and] a moderate to severe limitation bending and squatting." (R. 372).

On September 11, 2017, Dr. Fkiaras completed a Medical Source Statement of Ability to Do Work-Related Activities (Physical). (R. 373-79). He checked the boxes that Plaintiff could lift up to ten pounds frequently, and eleven to twenty pounds occasionally. (R. 373). Plaintiff could sit for two to three hours, stand for one hour, and walk for 45 minutes without interruption. (R. 374). In an eight-hour workday, Dr. Fkiaras indicated that Plaintiff could sit for seven to eight hours, stand for six hours, and walk for sixty to ninety minutes. (*Id.*). Dr. Fkiaras said

Plaintiff did not require use of a cane to ambulate. (*Id.*).  Dr. Fkiaras found Plaintiff could do light shopping, travel without a companion, ambulate without a wheelchair or two canes, and could use public transportation. (R. 378).  However, he noted Plaintiff may need assistance to care for his personal hygiene. (*Id.*).

**6.    Single Decision Maker Report**

On April 13, 2016, Single Decision Maker ("SDM") M. Corwin ("Corwin") completed a Disability Determination Explanation for Plaintiff. (R. 63-71).  Corwin determined that Plaintiff had a primary impairment of disorders of back-discogenic and degenerative, and a secondary impairment of asthma. (R. 66).  Both were severe. (*Id.*).  Corwin stated that Plaintiff's statements regarding symptoms were "[p]artially [c]onsistent" with the medical and non-medical evidence, as the "MER does not support the severity of the allegations." (R. 67).  Corwin determined that Plaintiff could "[s]tand, and/or walk (with normal breaks) for a total of" about six hours in an eight-hour workday and "[s]it (with normal breaks)" for the same amount of time. (*Id.*).  He found that Plaintiff could "cook, clean, do laundry, shop, complete his personal care, watch TV, socialize with friends and read," and that he could "change for [the] exam, get on/off [the] exam table and rise from a chair." (R. 69).  Corwin concluded that Plaintiff was not disabled, and that he could adjust to other work given his age, education, and RFC. (R. 69-70).

**7.    Montefiore Hospital**

On April 25, 2018, Plaintiff went to the Emergency Room at Montefiore's Jack D. Weiler Hospital ("Montefiore Weiler Hospital"), complaining of abdominal pain lasting for two days, along with nausea and vomiting. (R. 984-87).  Dr. Peter Dittmar diagnosed Plaintiff with alcohol-induced acute pancreatitis. (R. 986).  The hospital found Plaintiff "[n]egative for gait problem and myalgias." (R. 988).  Plaintiff's spine/back exam was "nontender." (R. 1000).  On

April 26, 2018, Registered Nurse ("RN") Kara McCarthy wrote that Plaintiff was "[a]mbulating independently." (R. 1024). In notes written on April 29 and 30, 2018, RN Carol Casullo wrote that Plaintiff was "ambulating in room with steady gait." (R. 1026, 1030). Social Worker Raquel Rieckehoff Rosario noted on April 29, 2018 that Plaintiff's functional status was "independent." (R. 1029). Throughout Plaintiff's hospitalization, the hospital rated him with "no limitation" as to his mobility. (R. 1058, 1062, 1065). However, Plaintiff did report pain radiating to his back during this visit. (R. 1080). Plaintiff was discharged on April 30, 2018. (R. 984).

On September 4, 2018, Plaintiff was again admitted to Montefiore Weiler Hospital. (R. 830). He complained of abdominal pain, nausea and vomiting. (R. 831-32). Dr. Victoria E. Adewunmi diagnosed him with abdominal pain and alcohol abuse. (R. 832). RN Mathew Thomas wrote in his September 4, 2018 note that Plaintiff was "able to ambulate without assistance." (R. 874). The hospital also noted "no limitation" on Plaintiff's mobility in the record on September 4, 2018. (R. 906). On September 5, 6 and 7, 2018, the hospital rated Plaintiff as "slightly limited" for mobility. (R. 907).

On September 1, 2020, Plaintiff had an MRI of his spine at Montefiore Advanced Imaging. (R. 823-28). The MRI revealed "[m]ultilevel degenerative changes most pronounced at L4-5 and L5-S1. AtL4-L5 (sic), there is a right central disc protrusion, effacing right subarticular recess contacting the traversing right L5 nerve root. Minimal right neuroforaminal narrowing. At L5-S1, there is a right central disc bulge, contacting the traversing right S1 nerve root without displacement. No neuroforaminal narrowing." (R. 827). Dr. Jimmy S. Lee, the radiologist, concluded that the MRI indicated stenosis. (*Id.*).

On June 19, 2021, Plaintiff went to Montefiore Weiler Hospital's Emergency Department, complaining of ankle pain and leg swelling, after slipping a week earlier, and was

"bitten by a dog." (R. 1347-49). Plaintiff explained to PA Jinny Cai that he had been "caring for his sister's dog (pitbull) who is aggressive with males," and after the dog bit him, he "tripped by accident and sprained his right ankle." (R. 1350). PA Cai observed that Plaintiff "has been ambulating and bearing weight on the ankle," and that he "[e]ndorses long car rides and [a] stagnant lifestyle." (*Id.*). PA Cai noted Plaintiff's arthralgias, joint swelling, and myalgias. (*Id.*). However, he also recorded no gait problem or issues to Plaintiff's range of motion. (R. 1350-51).

On August 19, 2021, Plaintiff was seen at Montefiore's Westchester Square Emergency Department. (R. 1306). Plaintiff suffered a bruised rib, sprained ankle, contusions and bruises following an accident. (R. 1297-304, 1326). Plaintiff said he had been hit by a "2 wheeler [but did] not know [if it was a] scooter or b[i]cycle while crossing the street." (R. 1478). The hospital rated his departure mobility as "[a]mbulatory" with crutches. (R. 1313). PA Sherin Zaman ordered crutches and painkillers for Plaintiff. (R. 1339).

On November 29, 2021, Plaintiff returned to Montefiore's Westchester Square Emergency Department for ankle pain. (R. 1431). Plaintiff stated he had missed a step and twisted his left ankle two days prior. (R. 1432). RN Elma Cintron observed "swelling and ecchymosis of left ankle. With difficulty ambulating." (*Id.*). Plaintiff told hospital staff that he "has been barely able to walk but he can put some weight on it." (R.1433). Dr. Michael Lahn observed arthralgias, a gait problem, "diffuse swelling of the left ankle and proximal left foot with a large amount of ecchymosis and tenderness" consistent with an injury. (R. 1433-35). The hospital rated his departure mobility as "[a]mbulatory with crutches," and noted he left the hospital himself. (R. 1455).

On December 3, 2021, Plaintiff followed up with Montefiore's Center for Orthopaedic Specialties for his left ankle sprain. (R. 1430). On December 14, 2021, Plaintiff was again seen

at Montefiore's Westchester Square Emergency Department. (R. 1395). Plaintiff complained of left ankle pain after a car "rolled over" his ankle. (R. 1418). Plaintiff had a contusion of his left foot and a sprain of his anterior talofibular ligament in his left ankle. (R. 1395). He was given painkillers and referred to orthopedic surgery. (*Id.*).

On January 5, 2022, Plaintiff was admitted to Montefiore's Westchester Square Emergency Department, complaining of abdominal pain with nausea and vomiting after drinking. (R. 1496-97). Plaintiff was diagnosed with alcohol-induced acute pancreatitis, hypophosphatasia, and a thrombocyte disorder. (R. 1496). On January 8, 2022, the hospital rated Plaintiff's mobility as "no limitation." (R. 1604).

**B.  Nonmedical Evidence**

**1.  Plaintiff's Testimony at the 2018 Hearing**

Plaintiff testified at the hearing in 2018 before ALJ Morgan. He stated he lived with his mother and girlfriend. (R. 39). Plaintiff received his GED and training for welding. (R. 40). In 2012, Plaintiff worked as a line cook at Osteria Grano. (R. 41). He has not worked or applied for any jobs since October 29, 2015. (R. 42-43).

Plaintiff testified that he has constant pain in his lower back radiating to his left leg. (R. 44). He clarified that his leg pain lasts a day or two, then is persistent, before disappearing and returning, but his back pain is constant. (*Id.*). Plaintiff reported that he experiences difficulty when brushing his teeth, bending, laying down, sitting or walking. (R. 44-45). He takes Gabapentin, Tizanidine, epidural injections, steroid injections and goes to physical therapy, but nothing helps with his pain. (R. 45-46, 51). Plaintiff said his pain gets worse over time, and his medications cause nausea and fatigue. (R. 45-47). Per his doctor's recommendation, Plaintiff was using a cane and seeing a surgeon for a second opinion. (R. 48). He testified that walking

- 19 -

around the block with or without the cane "is a little bit too much" due to the pain and that he has

to "stop, just take a breather." (R. 49). He wears a back brace as well. (R. 51). Plaintiff said he

could lift about ten to fifteen pounds if he needed. (R. 50).

Plaintiff testified that he had asthma as a child but not at the moment. (R. 49). He said he

had bunionectomy surgery in 2015, followed by another surgery in 2017. (R. 52-53). He

reported he was hospitalized in May 2018 at Montefiore Albert Einstein for pancreatitis. (R. 47).

Plaintiff stated his spends his days sitting, laying down, and walking around his apartment. (R.

50). He tries to do some laundry with assistance. (*Id.*).

**2.    Plaintiff's Testimony at the 2022 Hearing**

Plaintiff testified at the hearing before ALJ Carlton in 2022. He stated that Dr. Ciment

performed two surgeries relating to his hammer toes. (R. 572-73). Plaintiff said he worked as a

porter/dishwasher before becoming a cook in 2012 at two different restaurants owned by the

same person. (R. 578-79). He then worked in 2013 at another restaurant as a porter and

dishwasher. (R. 579). Plaintiff said he worked at Marshalls around 2015. (R. 578).

Plaintiff stated that the epidural injections did not improve his pain and some even made

it worse. (R. 581). He described "pain radiating from [his] lower back into [his] left leg,

sometimes into [his] right leg. [He has] a lot of tingliness [sic]. The spasms are uncontrollable."

(*Id.*). Plaintiff explained that he uses the cane and his back brace at all times, including for

standing. (R. 582). He said that standing or sitting for extended periods of time would be

difficult. (*Id.*). Plaintiff testified that he could only sit for about fifteen minutes without having

to stand up, but ALJ Carlton pointed out that Plaintiff had been sitting for more than thirty

minutes at that point. (R. 593). In response, Plaintiff said he was uncomfortable. (*Id.*). Plaintiff

can only walk about half a block before having to pause, and his mother does most of the

household chores for him. (R. 583). Plaintiff also testified that he has to lay down about a quarter of the day, and "fluctuate[s] between laying down, sitting down." (R. 595).

Additionally, Plaintiff testified that he has "a bunion that is returning, and . . . a couple of calluses that will not go away" which may necessitate another surgery. (R. 583). He reported that he requires assistance donning certain clothing items. (*Id.*). Plaintiff said he cannot lift more than ten pounds, sometimes has difficulty holding a cup of coffee, and falls often. (R. 584). In January 2022, Plaintiff went to the hospital for stomach pains due to a pancreatic disorder. (*Id.*). His mother has to help him when he showers, and he struggles to sleep due to pain. (R. 585). Plaintiff stated he does not feel comfortable driving because he has had "spasms to the point where [he] would literally stay stuck in a position and can't move." (R. 592).

Plaintiff reported that in 2021, he "stepped in a crack and [his] ankle just gave out," and he had to go to the hospital. (R. 585-86). In August 2021, Plaintiff was walking in a crosswalk, when a bicycle or scooter hit him. (R. 586-87). Plaintiff stated he visited Dr. Olsewski in July 2020 and again shortly afterwards.[6] (R. 587-88). He testified that Dr. Olsewski wanted to do surgery, but Plaintiff wanted to see if they could do something else. (*Id.*).

3. **Vocational Expert Jay Steinbrenner's Testimony in 2022**

Jay Steinbrenner, a vocational expert ("VE"), testified at Plaintiff's hearing in 2022. He identified Plaintiff's prior job as a kitchen porter. (R. 597). The VE determined that this job required medium exertion, was unskilled and required Specific Vocational Preparation ("SVP") two. (*Id.*). The ALJ then posed this hypothetical:

> Assume the individual is limited to sedentary work. The individual further requires the use of a one-handed cane for ambulation. Further, the individual cannot work on ladders, ropes, or scaffolds. The individual can occasionally use ramps and stairs, and can occasionally balance, stoop, crouch, crawl, and kneel. . . The

---

[6] The Court observes that there is no evidence of a post-July 2020 visit to Dr. Olsewski in the record. Plaintiff may be referring to his September 1, 2020 MRI. (R. 823-28).

> individual cannot perform work that requires the use of foot pedals and cannot work in unprotected heights or around dangerous machinery. I'm actually going to revisit those posturals. The individual can occasionally balance, stoop, and crouch, but not crawl or kneel. Clearly, past work's going to be eliminated. Can you identify jobs that can be done by that hypothetical individual?

(R. 597). The VE stated that individual would be able to perform the job of (1) telephone survey worker under Dictionary of Occupational Titles ("DOT") number 205.367-054, at the sedentary exertional category and at the unskilled level, SVP two, of which there are 33,577 jobs nationally; (2) semiconductor bonder under DOT number 726.685-066, at the sedentary exertional category and at the unskilled level, SVP two, of which there are 4,535 jobs nationally; and (3) charge account clerk under DOT number 205.367-014, at the sedentary exertional category and at the unskilled level, SVP two, of which there are 12,810 jobs nationally. (R. 598).

ALJ Carlton asked what jobs remained if he further limited the hypothetical individual to require a "sit-stand option, such that the individual would have to be able to perform their job duties either in a seated or standing position and be able to change between the two throughout the course of the day, assuming they could hold either position for at least 20 minutes." (R. 598). The VE responded, "[a]ll three of those jobs could still be done." (R. 599).

ALJ Carlton then asked if he further limited the hypothetical individual to require "that same one-handed cane – not just for ambulation but also for standing. And noting that the one-handed cane would be – had to be held in the dominant upper extremity. Would that individual still be able to perform those three positions or any of the others? And again, noting this includes the sit-stand option." (R. 599). The VE answered, "I believe that would eliminate those three positions." (*Id.*). The VE explained that half of the telephone survey worker jobs would remain, leaving about 16,500 jobs nationally, while the semiconductor bonder and the charge account clerk positions would be eliminated. (*Id.*). In addition, the VE added that those would be the only jobs that could be identified. (R. 600).

The VE further testified that the off-task time "would max out at 15" minutes in a typical

full time job, and if an individual spent more time off-task, their productivity may be

downgraded to unacceptable levels. (*Id.*). He added that if an individual misses "two or more

days per month on an ongoing basis, [they] can expect to be eventually terminated." (*Id.*). When

asked about an individual who would have to stand twice each hour for about five minutes,

spending about ten minutes off-task per hour, the VE stated that would exceed the fifteen

percent, which would "not be acceptable." (R. 601-02).

## C. ALJ Molleur's Decision

On remand, ALJ Molleur denied Plaintiff's application on September 29, 2023. (R. 546-

60). Under the five-step procedure promulgated by the Commissioner, ALJ Molleur evaluated

Plaintiff's claims. At step one, he found that Plaintiff has not engaged in substantial gainful

activity since October 29, 2015. (R. 549). At step two, ALJ Molleur determined Plaintiff had

severe impairments of degenerative disc disease of the lumbar spine, obesity, chronic pain

syndrome and hammer toes following corrective surgery. (*Id.*). He found that these impairments

"significantly limit the ability to perform basic work activities." (*Id.*). He also considered

Plaintiff's non-severe impairments of "alcoholic pancreatitis; asthma; hypertension; ethanol

dependence; and herpes." (*Id.*). ALJ Molleur added that the "record shows multiple hospital

visits due to abdominal pain and nausea from alcohol consumption." (*Id.*).

At step three, ALJ Molleur determined Plaintiff "does not have an impairment or

combination of impairments that meets or medically equals the severity of one of the listed

impairments" set forth in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 416.920(d),

416.925 and 416.926). (R. 550). ALJ Molleur stated Plaintiff's records "show antalgic gait,

lumbar and sacroiliac tenderness, abnormal tandem walk and decreased lumbar motion," and that

Plaintiff "requires use of a cane and back brace for support." (*Id.*).  However, ALJ Molleur also

determined that "other exams show an intact sensation, 1+ reflexes, normal heel to toe walk and

negative straight leg raises and Patrick's tests." (*Id.*).  He noted that "physical exams show

hyperkeratotic lesions on the plantar aspect of the 4th metatarsal, underlying nucleated lesion,

tenderness to touch, and a hyperkeratotic lesion to the dorsal aspect of the 5th digit." (R. 551).

ALJ Molleur also pointed out that "other exams show a negative pain to pressure in the heel

region, intact sensation and no weakness," and that the record "does not show an inability to use

the upper extremities to sustain fine and gross movements." (*Id.*).  ALJ Molleur concluded that

Plaintiff's obesity "does not affect his ability to ambulate effectively" and does not "preclude[]

work activities altogether." (*Id.*).

At step four, ALJ Molleur determined that Plaintiff has the "residual functional capacity

to perform sedentary work as defined in 20 C.F.R. § 416.967(a) except the [Plaintiff] requires

use of a one-hand cane for ambulation." (R. 551) (cleaned up).  He noted that Plaintiff cannot

"climb ladders, ropes or scaffolds but can occasionally climb ramps and stairs.  He can

occasionally balance, stoop, or crouch but cannot crawl or kneel." (*Id.*).  ALJ Molleur considered

Plaintiff's prior testimony, citing his need for assistance in dressing, history of falls, use of a

cane at all times and pain-induced sleep disturbances. (R. 552).  ALJ Molleur found that

Plaintiff's "medically determinable impairments could reasonably be expected to cause the

alleged symptoms; however, the [Plaintiff's] statements concerning the intensity, persistence and

limiting effects of these symptoms are not entirely consistent with the medical evidence and

other evidence in the record." (*Id.*).

As to Plaintiff's statements about the intensity, persistence and limiting effects of his

symptoms, the ALJ cited inconsistencies between Plaintiff's treating physician's notes and his

consultative exam with Dr. Fkiaras. (R. 553). ALJ Molleur noted that Dr. Fkiaras opined that Plaintiff had "full lumbar extension and lateral flexion bilaterally, full rotary movement bilaterally, and a negative bilateral straight leg raise," that Plaintiff "appeared to be in no distress and had a normal gait, was able to walk on his heels and used no assistive devices." (*Id.*). In addition, Dr. Fkiaras found that Plaintiff "needed no help changing for the exam or getting on and off the exam table, was able to rise from his chair without difficulty, and had full range of motion in his cervical spine and full motor strength in the bilateral upper and lower extremities." (*Id.*). Despite Plaintiff's complaints of low back pain, ALJ Molleur stated that "other exams also show an intact sensation, negative straight leg raise, Patrick's and Gaenslen's tests," as well as an electromyogram that "revealed no evidence of neuropathy or lumbar radiculopathy." (R. 553-54).

ALJ Molleur noted other consistencies in the medical records regarding Plaintiff's muscle strength. (R. 554). He cited treatment notes that show Plaintiff's "right foot pain had resolved with surgery," and that his ongoing complaints of left foot pain also decreased following surgery. (*Id.*). Dr. Fkiaras conducted a second consultative examination, and noted that Plaintiff had an antalgic gait, wore a back brace and had a decreased lumbar motion. (*Id.*). However, Plaintiff "appeared to be in no distress, was able to walk on his heels, needed no help changing for the exam or getting on and off the exam table, was able to rise from his chair without difficulty, and had full range of motion in the cervical and bilateral upper and lower extremities and full motor strength." (*Id.*). ALJ Molleur also noted continuing inconsistencies in Plaintiff's medical records in 2018 through 2020. (R. 554-55). He cited to a "lumbar [X]-ray [that] showed a mild 10-degree scoliosis with grade II rotation" and "retrolisthesis," and an MRI that showed "multilevel degenerative changes . . . with a right central disc protrusion." (R. 555).

ALJ Molleur observed that Plaintiff received medical treatment in June 2021 after trying to restrain his sister's dog, but he was able to "stand and walk." (*Id.*).  Following an accident in August 2021, Plaintiff complained of pain, which later improved. (R. 556).  In addition, Plaintiff visited a new pain management specialist in November 2022, who found Plaintiff "in no acute distress." (*Id.*).  ALJ Molleur found that "use of a cane is medically necessary" given Plaintiff's reports and the doctors' medical advice. (*Id.*).  As a result, ALJ Molleur concluded that Plaintiff "requires use of a one-hand cane for ambulation and would be unable to perform work that requires use of foot pedals," but could "perform sedentary work with postural and environmental limitations." (*Id.*).

ALJ Molleur accorded little weight to the opinion of the state agency consultant, M. Corwin, because he was "not an acceptable medical source." (R. 557).  However, ALJ Molleur assigned "significant weight" to the opinions of Dr. Fkiaras, the consultative examiner, regarding Plaintiff's physical limitations "because they are generally consistent with the record." (*Id.*).  ALJ Molleur noted that the limitations were "not inconsistent with the findings of an inability to walk on heels and toes, antalgic gait, decreased lumbar motion, difficulty with squatting and hammertoes," and that the findings "support a limitation to sedentary work." (*Id.*).  He gave "little weight" to Dr. Gopal's opinions because they were "extreme and not consistent with the record." (*Id.*).  ALJ Molleur explained that the "record does not support manipulative and neck limitations, as the [Plaintiff] has a full grip strength and full cervical motion." (*Id.*).  In addition, while "the record shows a restricted lumbar motion and tenderness, the [Plaintiff] presents for treatment in no acute distress and he consistently has a full motor strength and intact sensation." (R. 557-58).  ALJ Molleur concluded that Plaintiff had the RFC for "a range of sedentary work given the improvement in his symptoms with foot surgeries and medication for back pain," as

well as the need for a one-hand cane and further postural and environmental limitations. (R. 558).

At step five, ALJ Molleur determined that Plaintiff could not perform any past relevant work as a prep cook. (*Id.*). He concluded that Plaintiff was "not disabled" and that there was "work that exists in significant numbers in the national economy" that the Plaintiff can perform. (R. 559). ALJ Molleur explained that the VE testified that Plaintiff could work as (1) a semiconductor bonder, (2) a charge accounts clerk, or (3) a telephone survey worker. (*Id.*). All exist in significant numbers in the national economy. (*Id.*). He further found that Plaintiff has not been under a disability since October 29, 2015, as defined in the SSA, and Plaintiff's substance abuse disorder was not a contributing factor to the disability determination. (R. 559-60).

## II.  DISCUSSION

Plaintiff argues that the ALJ's decision should be reversed and remanded for further administrative proceedings because (1) the ALJ did not properly apply the treating physician rule; (2) the RFC was not supported by substantial evidence; and (3) the ALJ failed to properly consider time off-task and absenteeism. (Pl. Br. at 16-30). The Commissioner maintains that substantial evidence supports the ALJ's finding that Plaintiff was capable of "some sedentary work." (Comm'r Br. at 7-23).

## A.  Legal Standards

A claimant is disabled if he or she "is unable to 'to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.'" *Cichocki v. Astrue*, 729 F.3d 172, 176 (2d Cir. 2013) (per curiam)

(quoting 42 U.S.C. § 423(d)(1)(A)).  The SSA has enacted a five-step sequential analysis to

determine if a claimant is eligible for benefits based on a disability:

> (1) whether the claimant is currently engaged in substantial gainful activity; (2) whether the claimant has a severe impairment or combination of impairments; (3) whether the impairment meets or equals the severity of the specified impairments in the Listing of Impairments; (4) based on a "residual functional capacity" assessment, whether the claimant can perform any of his or her past relevant work despite the impairment; and (5) whether there are significant numbers of jobs in the national economy that the claimant can perform given the claimant's residual functional capacity, age, education, and work experience.

*McIntyre v. Colvin*, 758 F.3d 146, 150 (2d Cir. 2014) (citing *Burgess v. Astrue*, 537 F.3d 117,

120 (2d Cir. 2008); 20 C.F.R. §§ 404.1520(a)(4)(i)-(v), 416.920(a)(4)(i)-(v)).  The claimant has

the general burden of proving that he or she is statutorily disabled "and bears the burden of

proving his or her case at steps one through four." *Cichocki*, 729 F.3d at 176 (quoting *Burgess*,

537 F.3d at 128).  At step five, the burden then shifts "to the Commissioner to show there is

other work that [the claimant] can perform." *Brault v. Soc. Sec. Admin., Comm'r*, 683 F.3d 443,

445 (2d Cir. 2012) (per curiam).

When reviewing an appeal from a denial of SSI or disability benefits, the Court's review

is "limited to determining whether the SSA's conclusions were supported by substantial evidence

in the record and were based on a correct legal standard." *Selian v. Astrue*, 708 F.3d 409, 417 (2d

Cir. 2013) (per curiam) (quoting *Talavera v. Astrue*, 697 F.3d 145, 151 (2d Cir. 2012)); *see also*

42 U.S.C. § 405(g).  Substantial evidence means "relevant evidence as a reasonable mind might

accept as adequate to support a conclusion." *Biestek v. Berryhill*, 587 U.S. 97, 103 (2019)

(quoting *Consolidated Edison Co. of New York v. N.L.R.B.*, 305 U.S. 197, 229 (1938)).  Put

another way, a conclusion must be buttressed by "more than a mere scintilla" of record evidence.

*Id.* (quoting *Consolidated Edison*, 305 U.S. at 229).  The substantial evidence standard is "very

deferential" to the ALJ, "even more so than the clearly erroneous standard." *Brault*, 683 F.3d at

448 (internal quotations and citation omitted).  The Court does not substitute its judgment for the

agency's "or 'determine *de novo* whether [the claimant] is disabled.'" *Cage v. Comm'r of Soc.*

*Sec.*, 692 F.3d 118, 122 (2d Cir. 2012) (alteration in original) (quoting *Schaal v. Apfel*, 134 F.3d

496, 501 (2d Cir. 1998)).

However, where the proper legal standards were not applied and "might have affected the

disposition of the case, th[e] court cannot fulfill its statutory and constitutional duty to review the

decision of the administrative agency by simply deferring to the factual findings of the ALJ."

*Pollard v. Halter*, 377 F.3d 183, 189 (2d Cir. 2004) (quoting *Townley v. Heckler*, 748 F.2d 109,

112 (2d Cir. 1984)).  Therefore, "[f]ailure to apply the correct legal standards is grounds for

reversal." *Id.* (quoting *Townley*, 748 F.2d at 112).

"Where, as here, a disability claim was filed before March 27, 2017, the ALJ is required,

when weighing and analyzing the medical opinion evidence, to give controlling weight to the

opinions of the claimant's 'treating sources,' so long as those opinions are 'well-supported by

medically acceptable clinical and laboratory diagnostic techniques and . . . not inconsistent with

the other substantial evidence in [the] case record.'" *Arzu v. Saul*, 19-CV-6451 (VSB)(BCM),

2020 WL 9596205, at *15 (S.D.N.Y. Nov. 20, 2020), *report and recommendation adopted*, 2021

WL 1947290 (S.D.N.Y. May 12, 2021) (quoting 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2)).

Under the regulations, a treating physician is the claimant's own physician or other medical

source with whom the claimant has had an ongoing treating relationship. *See Cabrera v.*

*Berryhill*, 16-CV-4311 (AT)(JLC), 2017 WL 3172964, at *7 (S.D.N.Y. July 25, 2017), *report*

*and recommendation adopted sub nom. Cabrera v. Comm'r of Soc. Sec.*, 2017 WL 3686760

(S.D.N.Y. Aug. 25, 2017).  However, where "the treating physician issued opinions that [were]

not consistent with other substantial evidence in the record, such as the opinion of other medical

experts, the treating physician's opinion is not afforded controlling weight." *Cabrera*, 2017 WL

3172964, at *7 (citation omitted).

## B.    The ALJ's Duty to Develop the Record

As a threshold matter, the Court must be satisfied that the record is fully developed

before determining whether the Commissioner's decision is supported by substantial evidence.

*See Smoker v. Saul*, 19-CV-1539 (AT)(JLC), 2020 WL 2212404, at *9 (S.D.N.Y. May 7, 2020)

("Whether the ALJ has satisfied this duty to develop the record is a threshold question."). "[I]n

light of the 'essentially non-adversarial nature of a benefits proceeding,'" "[a]n ALJ, unlike a

judge at trial, has an affirmative duty to develop the record." *Vega v. Astrue*, No. 08 Civ. 1525

(LAP)(GWG), 2010 WL 2365851, at *2 (S.D.N.Y. June 10, 2010) (quoting *Pratts v. Chater*, 94

F.3d 34, 37 (2d Cir. 1996)). "This duty is present even when a claimant is represented by

counsel." *Atkinson v. Barnhart*, 87 F. App'x 766, 768 (2d Cir. 2004) (summary order) (citation

omitted). "Where there are gaps in the administrative record, remand to the Commissioner for

further development of the evidence is" appropriate. *Sobolewski v. Apfel*, 985 F. Supp. 300, 314

(E.D.N.Y. 1997) (citing *Pratts*, 94 F.3d at 39). "[W]here there are no obvious gaps in the

administrative record, and where the ALJ already possesses a 'complete medical history,' the

ALJ is under no obligation to seek additional information in advance of rejecting a benefits

claim." *Rosa v. Callahan*, 168 F.3d 72, 79 n.5 (2d Cir. 1999) (citing *Perez v. Chater*, 77 F.3d 41,

48 (2d. Cir. 1996)); *see also Pellam v. Astrue*, 508 F. App'x 87, 90 (2d Cir. 2013) (summary

order).

Here, the Court finds no obvious gaps in the record. There are over two thousand pages

of medical records, (R. 29-31, 269-305, 312-67, 387-524, 531-36, 795-99, 803-10, 814-19, 822-

2311), Plaintiff's functional report, (R. 210-18, 228-35), Plaintiff's disability report, (R. 219-27,

238-46), Plaintiff's work history report, (R. 259-66), medical opinions from the consultative

examiner, (R. 306-09, 368-78), Plaintiff's medical source statements, (R. 380-86, 525-30),

records from the disability examiner, (R. 62-71), and the hearing records, (R. 32-61, 567-603,

606-11).  At the 2022 hearing, counsel raised the issue of outstanding documents from

Stevenson, but confirmed nothing else was missing from the record. (R. 570-71).  ALJ Carlton

asked about documents relating to podiatric surgery that had not been added to the record, (R.

572), and he made a note to "develop the record" with these missing documents, (R. 573).  On

April 5, 2023, counsel for Plaintiff wrote ALJ Carlton to inform him that the "record . . . is

complete." (R. 794).  The record includes the additional Stevenson, Phillips Family Practice, and

Montefiore records. (R. 1954-2311).  Thus, the record is complete. *See Jordan v. Comm'r of Soc.

Sec.*, 142 F. App'x 542, 543 (2d Cir. 2005) (summary order) (finding that the ALJ fulfilled his

duty to develop the record where the ALJ kept the record open to permit counsel to obtain

additional records, counsel wrote the ALJ that he had "nothing further to add" to the record, and

counsel did not request the ALJ's help in obtaining additional documents).  While Plaintiff

argues in his Reply that the ALJ should have contacted the treating physician for clarification if

he found Plaintiff's hand and finger limitations on manipulation unclear, (Pl. Reply at 5), this is

the first time Plaintiff raises this argument or raises any issue with the completeness of the

record.  Moreover, the basis of Plaintiff's disability claim is his scoliosis, back pain and hammer

toes, not his hand and finger dexterity. (R. 63-66, 218, 222, 230).  Accordingly, the Court

concludes and respectfully recommends finding that the ALJ fulfilled his duty to develop the

record.

### C.  The Treating Physician Rule

Plaintiff argues that the ALJ failed to properly apply the treating physician rule when he accorded "little weight" to the opinion of Dr. Gopal, Plaintiff's treating pain management specialist. (Pl. Br. at 16-17).  The Commissioner maintains that Plaintiff's argument "is an evidentiary disagreement with how the ALJ viewed Dr. Gopal's responses." (Comm'r Br. at 11).

Under the treating physician rule, the SSA "give[s] more weight to medical opinions from [a claimant's] treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture" of the impairment and "may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations." 20 C.F.R. § 416.927(c)(2). The SSA considers whether the treating physician's opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." *Id.*  The clinical and laboratory techniques include "consideration of [a] patient's report of complaints, or history, [a]s an essential diagnostic tool." *Burgess*, 537 F.3d at 128 (internal citation and quotations omitted).  However, the SSA does not accord the treating physician's opinion controlling weight where the "treating physician issued opinions that are not consistent with . . . the opinions of other medical experts." *Id.* (citation omitted).

In determining the weight to afford a treating physician's opinion, the ALJ must consider: "(1) the frequency, length, nature, and extent of treatment; (2) the amount of medical evidence supporting the opinion; (3) the consistency of the opinion with the remaining medical evidence; and (4) whether the physician is a specialist." *Arzu*, 2020 WL 9596205, at *16 (quotations omitted) (quoting *Selian*, 708 F.3d at 418); *see also Burgess*, 537 F.3d at 129.  If the ALJ

discounts a treating physician's opinion, the ALJ must explain his reasons for not crediting the physician's opinion. *Burgess*, 537 F.3d at 129-30. "While failure to explicitly apply the *Burgess* factors is a procedural error, a reviewing court will not reverse the Commissioner's decision when the Commissioner has given 'good reasons' for its weight assignment." *Telesco v. Comm'r of Soc. Sec.*, 577 F. Supp. 3d 336, 343 (S.D.N.Y. 2021), *report and recommendation adopted*, No. 20-CV-8376 (MKV), 2022 WL 719271 (S.D.N.Y. Mar. 10, 2022) (quoting *Estrella v. Berryhill*, 925 F.3d 90, 96 (2d Cir. 2019)).

As Plaintiff filed his claim in 2015, the treating physician rule applies. 20 C.F.R. § 416.927(c)(2); *see also Arzu*, 2020 WL 9596205, at *15. Plaintiff asserts that "Dr. Gopal's opinions were consistent with her own treatment records," as well as with other providers' records, imaging tests and Plaintiff's testimony. (Pl. Br. at 17-18). He argues Dr. Gopal was a "specialist in the field of pain management who had a longitudinal treating relationship with" Plaintiff, (*id.* at 18), while the consultative examiner, Dr. Fkiaras, only examined Plaintiff twice and did not appear to have access to the full medical records, (*id.* at 23). ALJ Molleur's 2023 decision acknowledged Plaintiff's impairments and the results of his physical exams by multiple physicians, including treating physicians. (R. 550-51). The ALJ specifically cited to the records from Plaintiff's treating physician at New York Spine, (Exhibit 18), and Plaintiff's primary care physician, (Exhibit 25). (R. 552-58). In particular, ALJ Molleur considered Plaintiff's "intact sensation, negative straight leg raise, Patrick's and Gaenslen's tests" from New York Spine, as well as an objective electromyogram that did not reveal neuropathy or lumbar radiculopathy. (R. 554). ALJ Molleur also referenced Plaintiff's Function Report, where he listed his activities of daily living, (R. 228-35), and the 2016 report from the consultative examiner, (R. 306-09), to support his conclusion that Plaintiff can "prepare simple meals, use public transportation,

socialize with friends, and shop in stores." (R. 556).  The ALJ thus considered Plaintiff's "report of complaints, or history" along with the medical records. *Burgess*, 537 F.3d at 128.  He analyzed whether Dr. Gopal's opinion was "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record," as required by the regulations. 20 C.F.R. § 416.927(c)(2).  The ALJ concluded Dr. Gopal's opinion was inconsistent with other evidence in the record and, thus, assigned it little weight.

However, the ALJ erred in according significant weight to the opinion of the consultative examiner.  "[O]pinions from a one-time consultative physician are not ordinarily entitled to significant weight, in particular where that physician does not have the benefit of the complete medical record." *Callahan v. Berryhill*, No. 6:17-cv-06245(MAT), 2018 WL 1616058, at *5 (W.D.N.Y. Apr. 4, 2018) (collecting cases).  "Courts have consistently decided that when consultative physicians fail to read a claimant's MRI results prior to formulating a medical opinion, their opinion cannot constitute substantial evidence." *Fintz v. Kijakazi*, 22-CV-00337 (KAM), 2023 WL 2974132, at *4 (E.D.N.Y. Apr. 15, 2023) (citing *Burgess*, 537 F.3d at 131-32); *Garcia v. Comm'r of Soc. Sec.*, Case No. 22-CV-2449 (FB), 2023 WL 4904751, at *3 (E.D.N.Y. Aug. 1, 2023) (quoting *Fintz,* 2023 WL 297413, at *4) (remanding where neither the consultative examiner nor the state consultant had access to the MRI results).  Here, as in *Fintz*, the consultative examiner's reports do not include any reference to Plaintiff's MRIs, nor do they reference his past medical records. (R. 307-09, 369-79); *see Fintz*, 2023 WL 2974132, at *5.  Thus, "there is not enough evidence of whether [Dr. Fkiaras] considered or saw the Plaintiff's MRI results when drafting his medical opinion[s]." *Fintz*, 2023 WL 2974132, at *5.  Moreover, Dr. Fkiaras could not have reviewed Plaintiff's 2020 MRI results since that MRI was conducted

after his 2016 and 2017 examinations.  Therefore, the "Court finds the ALJ's reliance on [Dr. Fkiaras'] opinion deficient because there is no indication that [Dr. Fkiaras] considered or saw Plaintiff's MRIs." *Id.* at *6.[7]

ALJ Molleur found that the consultative examiner's opinion was more consistent with the medical evidence than the treating physician's opinion. (R. 553-58).  "The ALJ based that conclusion, . . . on the ALJ's own review of the medical record, without an opinion from a doctor who had also reviewed the records and reached a similar conclusion.  In the context of this case, that was error." *Benitez v. Comm'r of Soc. Sec.*, 20-CV-5026 (RWL), 2021 WL 4239244, at *16 (S.D.N.Y. Sept. 17, 2021).  Since there is no evidence that Dr. Fkiaras reviewed "important medical records, [his] opinion[s] cannot constitute 'good reasons' for overriding a treating physician's opinion or substantial evidence to support an RFC." *Id.* at *17 (collecting cases); *see also Tarsia v. Astrue*, 418 F. App'x 16, 18 (2d Cir. 2011) (summary order).  Therefore, it was "legal error [for ALJ Molleur] to rely on the opinion of a consultative examiner who did not have access to a claimant's MRI results." *Fintz*, 2023 WL 2974132, at *7; *see also Burgess,* 537 F.3d at 131.  As a result, the Court recommends remanding the matter for the ALJ to obtain an updated consultative examination, which includes consideration of Plaintiff's medical records, including X-rays, MRI results, and any EMG studies. *See Fintz*, 2023 WL 2974132, at *7.

Accordingly, the Court concludes and respectfully recommends finding that it was legal error for the ALJ to assign "significant weight" to the opinion of the consultative examiner and to allow his opinion to override that of the treating physician.

---

[7] Dr. Fkiaras' 2016 and 2017 reports were over seven and six years old at the time of ALJ Molleur's decision in 2023.  "While 'the mere passage of time' does not cause a medical opinion to 'expire,' a 'medical opinion may be stale if subsequent treatment notes indicate a claimant's condition has deteriorated.'" *Derwin L. v. Comm'r of Soc. Sec.*, 1:24-cv-05293-GRJ, 2025 WL 1092838, at *4 (S.D.N.Y. Apr. 11, 2025) (citation omitted).  Given the age of Dr. Fkiaras' reports, and the fact that a second MRI was conducted in 2020, the ALJ should have ordered an updated consultative examination. *See id.*

**D.  Substantial Evidence Does Not Support the ALJ's RFC Determination**

The ALJ determined that Plaintiff had the RFC to perform sedentary work as defined in 20 C.F.R. § 416.967(a) "except the claimant requires use of a one-hand cane for ambulation." (R. 551).  He also concluded that Plaintiff required other postural and environmental limitations, such as an inability to climb ladders, ropes or scaffolds; the ability to occasionally balance, stoop or crouch but not crawl or kneel; the inability to use foot pedals; and the inability to work around unprotected heights or dangerous machinery. (*Id.*).  Plaintiff argues that the ALJ's RFC determination is flawed because it is not supported by substantial evidence, failed to consider Plaintiff's inability to sit for extended periods, and did not properly assess Plaintiff's subjective complaints. (Pl. Br. at 23-29).  The Commissioner contends that substantial evidence supports the ALJ's findings. (Comm'r Br. at 7-8).

The Court "conduct[s] a plenary review of the administrative record to determine whether, considering the record as a whole, the Commissioner's decision is supported by substantial evidence." *Veino v. Barnhart*, 312 F.3d 578, 586 (2d Cir. 2002) (citation omitted). "Where the Commissioner's decision rests on adequate findings supported by evidence having rational probative force, we will not substitute our judgment for that of the Commissioner." *Id.* The ALJ must weigh all of the available evidence to make an RFC determination that is consistent with the record. *See Zacharopoulos v. Saul*, 516 F. Supp. 3d 211, 225 (E.D.N.Y. 2021) (citing *Matta v. Astrue,* 508 F. App'x 53, 56 (2d Cir. 2013)).  "The Social Security regulations define residual functional capacity as the most the claimant can still do in a work setting despite the limitations imposed by his impairments." *Selian*, 708 F.3d at 418 (citing 20 C.F.R. § 404.1545).  The "residual functional capacity must be assessed 'based on all the relevant evidence in [the claimant's] case record,' . . . including 'all of the relevant medical . . .

evidence.'" *Page v. Colvin*, 15-CV-792 (KNF), 2015 WL 9660016, at *5 (S.D.N.Y. Dec. 10, 2015) (citing 20 C.F.R. §§ 416.945(a)(1), (a)(3)).  When the RFC is supported by substantial evidence in the record, the Court will uphold it. *Zacharopoulos*, 516 F. Supp. 3d at 226 (citing *Barry v. Colvin*, 606 F. App'x 621, 622 n.1 (2d Cir. 2015)).

However, "the opinion of a consultative physician who 'did not review important medical records . . . cannot constitute . . . substantial evidence to support an RFC.'" *Fintz*, 2023 WL 2974132, at *4 (quoting *Benitez*, 2021 WL 4239244, at *17).  As explained *supra,* Section II.C, ALJ Molleur accorded "significant weight" to Dr. Fkiaras' opinions, even though Dr. Fkiaras did not review Plaintiff's MRIs.  Plaintiff's March 24, 2016 MRI revealed "multilevel disc space narrowing," "degenerative endplate change," "scattered disc desiccation," several disc bulges, and a small disc herniation. (R. 303).  In addition, Plaintiff's September 1, 2020 MRI revealed "[m]ultilevel degenerative changes most pronounced at L4-5 and L5-S1," as well as a "right central disc protrusion, effacing right subarticular recess contacting the traversing right L5 nerve root," and a "right central disc bulge, contacting the traversing right S1 nerve root without displacement" at L5-S1, indicating stenosis. (R. 827).  These findings may have impacted Dr. Fkiaras' opinion if he had reviewed them.  The Court cannot conclude that the "box-check forms" that Dr. Fkiaras used were substantial evidence, since there is no indication that he was aware of the MRI reports. *See Burgess*, 537 F.3d at 132.  As there is no evidence that Dr. Fkiaras reviewed Plaintiff's MRI reports, his "opinion cannot constitute . . . substantial evidence to support an RFC." *Benitez,* 2021 WL 4239244, at *17 (citing *Burgess*, 537 F.3d at 132).

Therefore, ALJ Molleur's reliance on Dr. Fkiaras' opinions in establishing Plaintiff's RFC was error. [8] *See Fintz*, 2023 WL 2974132, at *4.

Accordingly, the Court concludes and respectfully recommends finding that the RFC determination is not based on substantial evidence.

## III. CONCLUSION

For the foregoing reasons, I conclude and respectfully recommend granting Plaintiff's motion and remanding the case to the Commissioner, pursuant to sentence four of 42 U.S.C. § 405(g), for further administrative proceedings consistent with this Report and Recommendation.

## IV. NOTICE

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b)(2) of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days from the receipt of this Report and Recommendation to serve and file written objections. *See* Fed. R. Civ. P. 6(a) and (d) (rules for computing time). If copies of this Report and Recommendation are served upon the parties by mail, the parties shall have seventeen (17) days from receipt of the same to file and serve written objections. *See* Fed. R. Civ. P. 6(d). Objections and responses to objections, if any, shall be filed with the Clerk of the Court, with extra copies delivered to the chambers of the Honorable Nelson S. Román at the United States District Court, Southern District of New York, 300 Quarropas Street, White Plains, New York 10601, and to the chambers of the undersigned at the same address.

---

[8] The Court does not address Plaintiff's claim that the ALJ did not properly consider time off-task and absenteeism since the Court recommends remand. Nevertheless, on remand, the ALJ should also address the issues of time off-task and absenteeism, since Dr. Gopal specifically reported that Plaintiff's medications caused sleepiness, (R. 526), that Plaintiff's pain would interfere with his attention and concentration, (R. 381, 526), and that he would be absent from work more than three times a month, (R. 386, 530). *See Iglesias-Serrano v. Colvin*, 16 Civ. 418, 2016 WL 7441697, at *8 (S.D.N.Y. Dec. 23, 2016) (finding the ALJ's failure to address time off was legal error).

Requests for extensions of time to file objections must be made to the Honorable Nelson

S. Román and not to the undersigned.  Failure to file timely objections to this Report and

Recommendation will result in a waiver of objections and will preclude later appellate review of

any order of judgment that will be rendered. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a),

6(b), 6(d), 72(b); *Caidor v. Onondaga Cty.*, 517 F.3d 601, 604 (2d Cir. 2008).

Dated: July 16, 2025
      White Plains, New York

                                      **RESPECTFULLY SUBMITTED**:

                                      JUDITH C. McCARTHY
                                      United States Magistrate Judge